UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

ANGELA BOUGGESS, Administratrix of
the Estate if Michael Newby                                                                                   PLAINTIFF

v.                                                                                  CIVIL ACTION NO. 3:04CV-180-S

McKENZIE MATTINGLY, et al.                                                                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the court on motion of the defendant, McKenzie Mattingly, for summary judgment on the grounds of qualified and official immunity. This action alleges violation of the civil rights of the plaintiff's decedent, Michael Newby, when he was shot by Mattingly during an undercover drug operation. Mattingly was serving as an undercover narcotics officer for the Louisville-Jefferson County Metro Police Department David District Flex Platoon. The shooting took place on January 3, 2004, outside H & S Foods/Mattie's Liquors in Louisville, Kentucky. Newby died from those gunshot wounds.

### Background

The background facts briefly summarized are that in the late evening of January 3, 2004, the David District Flex Platoon had arranged a purchase of crack cocaine which was to take place in the vicinity of Mattie's Liquors. Mattingly was operating as the drug purchaser. He was wearing an electronic transmitter so that concealed members of the undercover team could listen to the transaction and move in after the purchase to arrest the dealer.

As Mattingly waited in his pickup truck in the parking lot, he was approached by a number of individuals including Newby who offered to sell him narcotics. Newby was armed, although Mattingly did not know it at that time. Negotiations ensued but no purchase was completed. As Mattingly was retrieving money from his pocket, a number of the sellers grabbed the money and ran.

Mattingly shouted "They got my money! They just took my money!" as he exited the truck in an attempt to discern which way the individuals had run. Mattingly and Newby confronted each other near the back of the truck where Mattingly had bent down to pick up a fallen $20 bill. A struggle occurred. Mattingly drew his weapon and has testified that Newby was trying to take it from him during the struggle. The gun discharged once toward the ground. Newby then broke away from Mattingly and moved away from him in the direction of the liquor store, between Mattingly's truck and a Jaguar parked next to it. As Newby reached the front of the vehicles and began going around the front of the Jaguar, Mattingly shot him three times. Newby passed in front of the Jaguar and continued around to the side of the building near the drive-thru where he was apprehended.

The Law

A. Qualified Immunity

A motion seeking qualified immunity requires the court to engage in a very narrow and circumscribed inquiry. In *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005) Judge Moore, also the author of the often cited case of *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) on this issue, provides a roadmap for trial courts in this circuit in evaluating claims of qualified immunity. Thus we quote at length from the *Sample* opinion:

> The Supreme Court has held...that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)...In reviewing a claim for qualified immunity, we employ a three-step inquiry:
>
> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.
>
> *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)...Qualified immunity must be granted if the plaintiff cannot establish each of these elements...

> "*[A]ll* claims that law enforcement officers have used excessive force - deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)...[I]n *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)...[t]he Court stated that the use of deadly force is only constitutionally reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* In evaluating an excessive force claim, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. 1865...
>
> In applying these principles, we have stated that "only in rare instances may an officer seize a suspect by use of deadly force." *Whitlow v. City of Louisville*, 39 Fed.Appx. 297, 302-03 (6th Cir. 2002). We have upheld the use of deadly force by a police officer when the factual situation revealed a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer. [citations omitted].

*Sample*, 409 F.3d at 695-98.[1]

### B. Summary Judgment

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be

---

[1] The Supreme Court announced a two-step inquiry for evaluating qualified immunity claims in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Sixth Circuit explained in *Sample*, however, that its "three-step approach correctly encompasses the Supreme Court's approach to qualified immunity claims and serves to ensure government officials the proper protection from civil suit under the law." *Sample*, 409 F.3d at 696, n. 3. We find that an analysis under *Sample* yields the same essential inquiry as set forth in *Saucier*. If anything, *Sample* more clearly delineates the extent to which we must respect judgment calls made by officers in urgent situations. *See, Sample*, *Id.* ("reasonable mistakes can be made as to the legal constraints on particular police conduct." *quoting, Saucier*).

such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Matttingly seeks immunity from suit on the ground that there are no genuine issues of material fact and that he is entitled to summary judgment as a matter of law. More specifically, he contends that there is no dispute of fact that:

> 1. Newby was attempting to sell crack cocaine to Officer Mattingly while he was working undercover.
>
> 2. Newby was armed with a handgun in the waistband of his pants.
>
> 3. During the attempted sale of cocaine, Newby made a movement to his waistband which made Officer Mattingly believe he was carrying a gun.
>
> 4. Newby fought with Officer Mattingly in an attempt to take Officer Mattingly's gun away from him.

Mattingly Reply in Support of Motion for Summary Judgment ("Reply"), p. 7. Mattingly urges that these facts establish that he did not deprive Newby of his constitutional rights by his use of deadly force because they establish that he shot an armed drug dealer who had just attempted to take his weapon and shoot him. Motion for Summary Judgment ("Motion"), p. 8. He further contends that if a constitutional violation were found, there was no clearly established law making it unconstitutional to use deadly force in such a confrontation with an armed felon. *Id*., p. 13.

The plaintiff claims to dispute all four of the facts recited by Mattingly. However, she has not come forward with any record evidence to call into question that Newby was attempting to sell crack cocaine to Mattingly (No. 1), that Newby was armed with a handgun in the waistband of his

pants (No. 2), or that Newby fought with Mattingly and attempted to take his gun (No. 4). She has come forward with evidence to call into question Mattingly's account of Newby's actions during the drug transaction (No. 3). We find that this third fact and others discussed later in this opinion evidence that genuine issues of material fact exist which preclude the court from granting Mattingly qualified immunity as a matter of law.[2]

<u>Analysis</u>

Constitutional Violation?

A.

The first step in the inquiry is to determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation occurred.

> The Supreme Court has instructed courts to look to the totality of the circumstances to determine whether the force used was reasonable. *Tennessee v. Garner*...The time frame is a crucial aspect of excessive force cases...[T]he appropriate method of analysis is to "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage."

*Dickerson*, 101 F.3d at 1161, *quoting, Plakas v. Drinski*, 19 F.3d 1143, (7th Cir.), *cert. denied*, 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994); *also citing, Greenridge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991)(holding that *Graham's* objective reasonableness test for excessive use of deadly force requires the factfinder to focus on the very moment the officers make the "split-second judgments" and not on the events leading up to the time immediately prior to the shooting); *Sherrod v. Berry*, 856 F.2d 802, 805-06 (7th Cir. 1988)(en banc)(stating that in an excessive force case, courts should look to the split second before the officer had to decide what to do).

---

[2] The court has been provided a limited number of documents in connection with this motion. For purposes of this ruling, we have relied only upon Mattingly's grand jury testimony, the report of the Professional Services Unit, and statements taken during the Unit's investigation. The remaining materials were either irrelevant or were unnecessary to the decision. The recitation of various facts herein is intended only to illustrate areas of dispute, not to suggest any opinion as to the validity or persuasiveness of any argument on the merits of the claims.

Mattingly contends that he had probable cause to believe that Newby posed a threat of serious physical harm to himself, the other officers, and bystanders because his observation of Newby led him to believe that he was armed, and because Newby had attempted to take his gun away from him.  He urges that his use of deadly force as Newby moved away from him was justified on this basis.  Reply, p. 5.  He contends that no other facts are necessary to the analysis in order to find that he was permitted to use deadly force under the law.  He further contends that deadly force was justified because he believed that Newby was not running from him, but rather was moving to a position to draw his gun and shoot him, and thus he believed that an ongoing threat existed to himself and others.  Motion, p. 4.

Initially, we note that the fact that Newby was armed at the time of the incident is not relevant to the question of whether Mattingly reasonably believed at the time that the use of deadly force was necessary.  In *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) the court found that evidence that the suspect was *unarmed* was irrelevant to the excessive force inquiry.  "Under Fed.R.Civ.P. 401, "relevancy is a relationship between a proffered item of evidence and a 'fact that is of consequence to the determination of the action.'" *Sherrod*, 856 F.2d at 804, *quoting*, 1 Weinstein's Evidence ¶ 401[03], pp. 401-17.  The court in *Sherrod* explained that

> Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment.  Were the rule otherwise, as the trial court ruled in this instance, the jury would possess more information than the officer possessed when he made the crucial decision.  Thus we are convinced that the objective reasonableness standard...requires that [the officer's] liability be determined exclusively upon an examination and weighing of the information [the officer] possessed immediately prior to and at the very moment he fired the fatal shot...[C]ourts and juries must determine the propriety of the officer's actions based upon a thorough review of the knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgment as to whether the use of deadly force was warranted...Our holding is consistent with...*Tennessee v. Garner*...

*Sherrod*, 856 F.2d at 805.[3]

Next we note that Mattingly did not testify that he determined to use deadly force based solely upon a belief that Newby was armed and that he had tried to take his gun. Rather, he testified that his decision to use deadly force was made at a later point in the encounter – after Newby had broken away from him and was purportedly attempting to draw his gun and shoot him. It would thus be error for the court to find the use of deadly force to be permissible based upon facts not asserted by the officer. Professional Standards Unit April 2, 2004 Findings, Summary, and Conclusion ("Report"), p. 12, Investigator's Note.

In determining how broadly to view the circumstances from which we analyze the use of force, we look to "the very moment" or the "split second" before the officer decided to act, in order to segment the events as required by the Sixth Circuit. Mattingly determined to shoot Newby at a point after the struggle over Mattingly's weapon and after Newby had moved away from him. *Id*.

Indeed, after Newby was unsuccessful in taking Mattingly's weapon and began to move away from the confrontation, Mattingly was faced with new circumstances. The incident was no longer a direct, physical struggle in which Newby was attempting to disarm Mattingly. In fact, Newby had been unsuccessful in disarming Mattingly and had moved to a different location. Other officers were on the scene or advancing on the scene. There were bystanders then in closer proximity to the encounter. We must therefore evaluate the situation as it existed after Newby had moved away from Mattingly. Mattingly contends that Newby's actions after he moved away from him led him to believe that Newby posed a continuing threat to himself and others.

Our analysis must consider all of the knowledge possessed by Mattingly at the moment he determined to employ deadly force. We cannot simply take a snapshot of the moment and consider it in isolation from other information. Rather the totality of knowledge possessed by Mattingly as

---

[3] Our reference to *Sherrod*, *supra*. is not meant to indicate that we find that evidence that Newby was armed is inadmissible for all purposes. We are simply not going to consider it here.

he faced the moment of decision is relevant to the inquiry. *Tennessee v. Garner, supra*. The *Dickerson* segmenting exercise is useful to the extent that it helps the court focus on the moment the officer determined to employ deadly force. However, our consideration of the totality of the knowledge possessed by Mattingly as he arrived at that moment requires us to reach back to earlier events for this purpose. *See, ie., Howser v. Anderson*, 150 Fed.Appx. 533 (6th Cir. 2005); *Claybrook v. Birchwell*, 274 F.3d 1098 (6th Cir. 2001)("all events taking place in the second and third segments are material to our analysis").

Thus we must consider Mattingly's contentions that he had reason to believe Newby was armed, and that be believed that Newby had tried to shoot him when we consider Mattingly's assessment of the situation immediately prior to the shooting. We will consider these contentions in turn.

B.

Mattingly testified that he believed that Newby was armed because of his behavior during the drug transaction that Mattingly described as "unnatural." Mattingly Grand Jury Testimony("G.J."), p. 5-6. Mattingly testified that during negotiation of the drug purchase he felt nervous because the sellers were reaching into his truck and he thought that they might try to "jack him up" (rob him). Mattingly testified that

> I guess they could see that I was acting kind of nervous, so Michael Newby reaches in past Kenny [a seller], at my window and he goes, "W-H-E-W," and so I did the same thing real quick, I went "W-H-E-W," and when I did that, he jumped back and he pulled his shirt up. When he pulled his shirt up, I thought he had a gun because I've been trained by the Bureau of Alcohol and Firearms to observe for certain things that people do to let me know that they're carrying concealed weapons. One of those things is called a security check. It's, you're checking the weapon to make sure it's there...[T]hat movement, jumping back and pulling his waistband up was an unnatural movement and I looked to see if he had a gun. I didn't see one but I thought, he's got a gun, you know, I didn't see any other reason why he would do that.

G.J. 5-6. *see also,* Report, p. 11; PSU - Mattingly Q. 158.

The plaintiff contends that other evidence in the record raises the question of whether this "security check" described by Mattingly occurred. First, Mattingly was wearing an electronic device, commonly known as a body wire, so that the five other officers involved in the operation could hear what took place and know when to move in to arrest the suspects. There is no dispute that the body wire was working and that the other officers heard the drug transaction occur just as Mattingly described it. However, none of the other officers heard an exclamation of "W-H-E-W" made by either Newby or Mattingly. Report, p. 6, PIU - Initial Interviews; PSU - Thomerson Q. 254. At no time either during the incident or after the shooting did Mattingly indicate to any other officer that he believed Newby was armed. Mattingly explained his lack of any warning to his fellow officers after the shooting as "shock." Officer Thomerson who was the first officer to approach and assist Mattingly testified that after the incident Mattingly appeared to be functioning normally. Report, p.3, Summary; p. 13, Investigative Note; PSU - Mattingly Qs 192, 339, 342, 353, 354; PSU - Thomerson Qs 265, 279-81. Finally, Mattingly testified that Newby engaged in similar "security check" behavior as he moved away from Mattingly between the parked vehicles. He stated that Newby moved away from him, repeatedly looked down at his waistband, continually looked at Mattingly, and repeatedly pulled up his shirt while keeping his hands down around his right front pocket. G.J. pp. 8-10; Report, p. 11, Qs 266, 267. This segment of the encounter will be discussed in greater detail below. However, as with the first "security check," the plaintiff has come forward with evidence raising a question as to whether this second "security check" occurred.

We offer no opinion on the evidence put forth on these matters by either party. Rather, construing the evidence in the light most favorable to the plaintiff, we conclude that a genuine issue of material fact has been shown concerning whether Newby behaved in such a way during the drug transaction as to lead Mattingly, in his experience as a police officer, to believe that Newby was armed. Mattingly contends that his belief that Newby was armed was based upon specific behavior.

Thus a genuine issues of material fact concerning what behavior occurred necessarily precludes a grant of qualified immunity.

C.

It is undisputed that after Mattingly's money was taken he existed his truck and a struggle ensued between Mattingly and Newby. Although the plaintiff disputes that Newby attempted to take Mattingly's gun, she has not come forward with record evidence to support this assertion. It is also undisputed that Newby did not succeed in taking the gun, and that at some point he broke away and moved away from Mattingly.

D.

Mattingly contends that while Newby was moving away, he believed that Newby was putting distance between them in order for Newby to retrieve his weapon from his waistband and shoot him. Report, PSU - Mattingly Q 288. Thus he believed that the threat continued and he feared that Newby was trying to kill him. Mattingly described the actions of Newby in moving away from him in detail:

> ...I'm just thinking about what just happened to me [the scuffle over the gun] and what he is doing, is he running away. And I'm watching him, and he's doing like this, he keeps looking at me and going down to his waist and pulling his shirt up, did that several times and keeps bumping into the car because he's not looking where he's going. He never once looked where he was going. He's looking back at me and he's pulling his shirt up and looking down and he's bumping into the car, bumps around the front of the car and he gets about halfway to the front of the car. I realized, you know, I thought this guys had a gun from something he'd done earlier, and I said, he's trying to get a gun out, you know, he's trying to get a gun out to kill me. Six and a half years that I've been a police officer, you know there's been a lot of people running from me and Michael Newby could have ran that night, it would have been a different situation. I'd never been able to catch him, they're been a different outcome but he wasn't running...I don't have to give him, you know, I don't need to wait for him to get out and shoot me, but there was no doubt in my mind that he had a gun and that's what he was going to do and I felt like he was, you know, and we'd just been in a struggle but the fight was still on. I feel like he was getting around the car, he was going to shoot me because he never once looked where he was going. And so he got to the front, about, covered about half the width, this is the front of the car and theat's when I started pulling the trigger...His hands were down

- 10 -

> here near his waist. He was moving 'em...He's turned toward me like this. He, you know, like I said, been looking back at me and looking down there at his waist and he was right like this when I started pulling the trigger...And then he got to the corner by the liquor store and I don't know if he turned to go between the car and the building or what happened but that was the only time that he looked away from either me or his waistband.

G.J. pp. 8-9; *See also*, Report, p. 3 Summary; p. 11, PSU - Mattingly Qs. 266, 267, 304, 393.

The plaintiff points to other evidence which raises a genuine issue of material fact concerning Mattingly's version of the moments immediately preceding the shooting.

Officer Thomerson was the "eye" during the surveillance, having the best vantage point to see the events. Report, p. 6, Summary. He was not able to see Mattingly during the initial drug transaction, but witnessed the struggle with Newby after Mattingly got out of his truck and events thereafter. *Id.* The Report summarizes Thomerson involvement on the scene:

> One of the responding back-up officers, Thomerson, was following two of the fleeing subjects and he saw the struggle on the parking lot. Officer Thomerson pulled his undercover police vehicle onto the liquor store parking lot and got out to assist Mattingly.
>
> As Officer Thomerson opened his door, Mattingly's gun discharged 1 round. When this shot went off, Newby was on Mattingly's back, still struggling with him over Mattingly's gun...Officer Thomerson rushed toward the two while shouting verbal commands. Before he could get to them, Newby and Mattingly broke apart... Mattingly stepped forward from the point of his struggle in front of Thomerson, so Thomerson moved around to the opposite side of the black Jaguar that was parked to the left of Mattingly's truck. Newby fled toward the store by moving between the two, parked vehicles.

Report, pp. 2-3, Summary. Thomerson was asked whether Newby ever pulled up his shirt. He responded "No." Report, p. 8, PSU - Thomerson Q. 298. He was asked if Newby ever turned his head to look in a downward direction or in the direction of Mattingly. Thomerson responded "No." Report, p. 8, PSU - Thomerson Qs. 117-122. Thomerson said that the only time he saw Newby go to his waistband was when he was in between the car and wall in the drive-thru which was after he had been shot. Report, p. 8, PSU - Thomerson Q. 238. In Thomerson's initial PIU interview he stated repeatedly that when he broke away from Mattingly, Newby was running away. Report, p.

8, PIU - Thomerson Qs. 71, 84.  He later explained "Yeah,...I said running, and I think I said fleeing a few times too...he was running away...but it wasn't like he was in a full blast run...he was moving fast, but wasn't outright just running and getting away."  Report, p. 8, PSU - Thomerson Q. 232.

An employee of Mattie's Liquors, Greg Hill, testified that Newby was running away from Mattingly toward the store.  Report, p. 8, PIU - Hill Q. 31.  Hill testified that he was in the window of the liquor store at the time and saw Mattingly shoot Newby.  He stated that "I froze.  I should have hit the ground.  But you know I was behind the bullet proofing and everything, I didn't go down, I stayed there and looked at it."  Hill, 1/4/04 Official Statement, p. 8.  He stated that Newby was at the front of the car when he got shot.  *Id.*  Hill stated that Newby was a few feet from him when he was shot and that "I saw the kid's eyes, the kid was facing me.  I saw his eyes when he got hit."  Report, p. 12, PIU - Hill Q31.  The coroner, Barbara Weakley-Jones, testified before the grand jury that Newby had three gunshot wounds to the back.  The bullets traveled back to front, down to up 45°, and left to right.  Weakley-Jones, G.J. 14:33.  She testified that he may have been turning when the shots were fired, but she could not say in which direction.  *Id.*  She stated that all three rounds entered and traveled through Newby's body at a horizontal angle (When facing Newby's back - from left to right).  Report, p. 12, PSU - Weakley-Jones Qs. 16, 17.

Again, we offer no opinion on the evidence offered by either party.  Rather, construing the evidence in the light most favorable to the plaintiff, we conclude that genuine issues of material fact have been shown concerning what occurred after Newby broke away from Mattingly.  Mattingly claims that Newby's actions led him to believe that the threat to his life and the lives of others was real and ongoing, and that on this basis he employed deadly force.  Because a genuine issue of material fact has been shown concerning Newby's actions in the moments immediately preceding Mattingly's decision to shoot, summary judgment on qualified immunity is precluded.

### Clearly Established Right?

Mattingly contends that even if we were to find a constitutional violation, he is still entitled to qualified immunity on the ground that the right was not clearly established in the law at that time. We disagree. As noted in *Sample*, *supra.,*

> We have held that it has been clearly established in this circuit for the last twenty years that a criminal suspect "ha[s] a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or to others during flight." *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988). This articulation of the *Garner* rule is clearly established even in situations with diverse factual distinctions...Thus regardless of whether the incident took place at day or night, in a building or outside, whether the suspect is fleeing or found, armed or unarmed, intoxicated or sober, mentally unbalanced or sane, it is clearly established that a reasonable police officer may not shoot the suspect unless the suspect poses a perceived threat of serious physical harm to the officer or others. These factual distinctions between cases do not alter the certainty about the law itself.

*Sample*, 409 F.3d at 699 (rejecting argument that *Brousseau v. Haugen*, 125 S.Ct. 596 (2004) required higher level of factual specificity in order to constitute fair warning of the contours of the 4th Amendment right).

As discussed *infra*, genuine issues of material fact have been shown to exist with respect to the events transpiring prior to the shooting. Thus we may not accept at face value herein Mattingly's assertion that he believed, based upon those events, that Newby posed a threat to himself and others.

### Sufficient Evidence?

The plaintiff has offered sufficient evidence that, if proved, would establish that Mattingly's actions were objectively unreasonable in light of clearly established law. If it is proved that the events did not occur as Mattingly contended, then no basis existed for Mattingly to believe that Newby was armed. The standard was clearly established in this circuit prohibiting the use of deadly force against a suspect unless he was perceived to pose a threat during flight. *Sample*, *supra*. Therefore, a decision to employ deadly force would be objectively unreasonable where no perception of threat is proven.

- 14 -

#### Official Immunity

Mattingly urges that he is entitled to official immunity from the state law claims in this action. We conclude that the genuine issues of material fact which preclude the grant of qualified immunity also preclude the grant of official immunity herein, as qualified immunity applies only to the negligent performance by a public officer of (1) discretionary acts or functions exercised (2) in good faith, and (3) within the scope of the public officer's authority. *Lamb v. Holmes*, 162 S.W.3d 902, 908 (Ky. 2005)(*quoting*, Restatement (Second) of Torts, § 895D).

Further, the plaintiff has alleged violation of the policies and procedures of the Louisville Metro Police Department. At least one panel of the Court of Appeals of Kentucky has held that an act specifically mandated by a police department's rules or regulations is ministerial and would not be subject to official immunity. *Hughes v. City of Louisville*, 2004 WL 362266 (Ky.App. Feb. 27, 2004). We conclude therefore that Mattingly has not shown that he is entitled to official immunity as a matter of law.

For the reasons set forth above the court concludes that genuine issues of material fact exist which preclude the grant of qualified and official immunity to Mattingly and mandate denial of his motion.

Motion having been made and for the reasons set forth hereinabove and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that the motion of the defendant, McKenzie Mattingly, for summary judgment (DN 39) is **DENIED**.

**IT IS SO ORDERED**.